Good morning, Your Honors, and may it please the Court. My name is Sabrina DeMass, and along with my co-counsel Louis Gordon, I represent the petitioner in this matter, Anatoly Valushkin. I will be addressing two issues before this Court this morning, Your Honors. The first is that petitioner's conviction under 18 U.S.C. 1951 does not qualify as a crime involving moral turpitude, and secondly, that the agency engaged—excuse me, failed to engage in any fact findings to support its determination that this conviction was a violent or dangerous crime. Mr. Gordon will be addressing petitioner's due process claims, the agency's decision on his deferral of removal, and the agency's denial of petitioner's pro se motion to reopen and remand. Your Honors, I request 11 minutes of argument time for my portion of the arguments with one of those minutes reserved for rebuttal, and Mr. Gordon— And if either you or your co-counsel use up the time— Yes, Your Honor, I will. You can sue us. Thank you. Your Honors, in 2010 this Court issued its decision in Nunez v. Holder, in which it stated that most crimes that did not involve fraud would only involve moral turpitude if they involved a specific intent to injure a victim, actual injury to the victim, or protected class of victim. Now, in stating this, the Court did recognize that to that point, this Court and the Board's case law on crimes involving moral turpitude had no identifiable unifying standard, and as such, there would be cases, particularly cases that had already been decided, that would not meet this standard, and one of those cases is the Marmalado Compost case that the Respondent had cited in his 20 HA letters. Nevertheless, this Court stated that it expected that standard would encompass, quote, the vast majority of crimes involving moral turpitude, and since the decision in Nunez, this Court has reiterated that standard in seven published cases, including an En Vant case, and most recently, last month, in the Coquico v. Lynch decision. Now, as a preliminary matter, Your Honors, the statutory language of 18 U.S.C. 1951 does not require a specific intent to injure, actual injury to a victim, or protected class of victim, and it doesn't fall under the standard articulated in Nunez, but in more detail, this Court in Coquico addressed this Court's prior decision in Latter Singh v. Holder on PC 422, criminal threats, and that was because the statute at issue in Coquico involved an intent to create apprehension or fear in the peace officer, and the Court wanted to distinguish why that case would not be like criminal threats, and it did so by noting that 422 has two additional requirements that were not present in the statute at issue in Coquico. One is that the threats had to be those of great bodily injury or death, and two, that the victim had to be in an actual sustained fear as a result of the threats. Now, the Court noted that the statute in Coquico, which had to do with pointing a laser scope at a peace officer, didn't require either of these. In fact, they noted that the victim didn't have to be aware that the scope was being pointed at them. Now, similarly here, Your Honor, the threats that are criminalized under 18 U.S.C. 1951 don't have to be those of great bodily injury or death, and this Court held in Carbo v. United States that a conviction for attempted extortion doesn't require the prosecution to show the generation of fear in the victim. Did the BIA talk about this? The BIA did talk about the crime involving moral turpitude. But the more nuanced argument you're giving us today is not one that the BIA discussed, was it? No. And that's because the argument wasn't made to the BIA in those terms, was it? The argument was not made in those precise terms, Your Honor. So why should we say the issue's been exhausted if the BIA wasn't given the opportunity to address this argument? How can we? The BIA did address the argument as to whether or not it was a crime involving moral turpitude. Sure, but that's not what you're arguing to us in broad terms. You're offering something much more sophisticated. Well, the Coquico decision, for example, Your Honors, wasn't out. Neither were three or four of the other decisions at the time. So? Well, so they couldn't be raised, Your Honors. Well, so you go back to the Board and see if that changes its mind. But you haven't presented this argument to the Board, have you? Well, that's part of the reason that Petitioner would ask for his appeal to be sustained, since the Board could revisit this issue in light of the new Ninth Circuit case law. Can't you ask the Board to reopen it? They're past the 90-day statutory period for a motion to reopen, Your Honor. So it would be a particularly uphill battle to go for a motion to reopen at the Board of Immigration circumstances. And I do think that the issue has been preserved sufficiently. That an alien might find the Ninth Circuit friendlier than the BIA doesn't necessarily give the Ninth Circuit the obligation to keep giving you more chances. I think the issue has been preserved anyway, Your Honors. Both sides have briefed it back and forth in supplemental briefing. This Court didn't talk about it. To the BIA? No, here, Your Honor. That doesn't tell me how the matter has been preserved in front of the BIA. But we've touched that point. Go on to whatever you have to say about the substance of it. Okay, Your Honor. Thank you. The only other point that I would mention on the crime involving moral turpitude, other than the two distinctions that I've made so far, is that the Board did not cite to a published decision addressing this particular statute in its decision. And of course, its decision itself was not published. And so I don't think we're in an environment where Chevron deference would be necessary to the Board's decision anyway. Well, the stipulated facts statement says that your client enabled two other people to drive to the residence of the victims, where those two other people used threats of force or violence and fear to threaten and extort them. How is that not a crime of moral turpitude? I would say, Your Honor, that a specific, an attempted threat of violence, because the account to which the petitioner pled does say an attempt to do the following thing. An attempted threat of violence is not the same thing as a specific intent to actually injure. You would have to have an intent to carry through on that. No, you're hoping the extortion works and you extract money by way of the threat. I don't see how that makes it any less morally evil. If you get away with it, if you threaten to knock somebody upside the head unless he gives you his money, and he gives you his money, then I'm okay because I didn't actually have to knock him upside the head. That's a tough distinction, isn't it? I don't think so, Your Honor, particularly because the categorical approach that has been enunciated for evaluating crimes involving moral turpitude is really intended to sort of prevent the scenario of analysis that you just employed in your hypothetical. How is that? Because it focuses more on the facts, Your Honor, whether or not he says, oh, it's good, I didn't have to beat you over the head. No, attempted extortion is by definition using the threat of violence in order to get what you want. Well, the threat of violence is inherent, isn't it? A threat of violence is inherent, Your Honor, but a threat of violence is not the same as a specific intent to injure or actual injury to the victim. Why not? Because you would have to have an intention to act on your threat in order to specifically intend injury. How about theft? Is theft a crime of moral turpitude? There is case law that would suggest that an attempt to permanently deprive under a theft crime could render it one of moral turpitude. Why doesn't this fit in that category? Again, Your Honor, I would return to this Court's attempt in Nunez to articulate a unified standard for when these things, these types of crimes would be those involving moral turpitude. So you'd throw away all the cases that find theft a crime of moral turpitude because it doesn't fit this unified standard? I wouldn't throw out the old cases, Your Honor, because Nunez did recognize that there would be cases that were outliers, such as the Marmaleo Compost case that was cited by the Court. But I think going forward, the attempt was to bring a more unified sense of what crime should be deemed morally turpitudinous. Well, good luck with our effort, but we've still got those outliers, and this seems to fall well within the outliers. Well, this Court has never held that 18 U.S.C. 1951 in particular is a crime involving moral turpitude, and neither has the Board. They've addressed other types of extortionary statutes. They've addressed the statute, the federal statute that predated the Hobbs Act, which is what the petitioner was convicted under, but never this one. But moving to my second point, Your Honor, this Court recently issued a decision in Torres Falde Villas v. Lynch in which it determined that it would not review an ultimate decision by the agency that a crime was violent or dangerous because such a determination would be a fact-intensive weighing of equities. But here, Your Honor, the agency did not engage in any fact-finding at all. The first immigration judge who heard petitioner's case made no fact-finding at all about the violent or dangerous nature. And on appeal to the Board, the Board simply said that per se, because there was a threat of violence, that they would deem it violent or dangerous. On remand, the second immigration judge made no fact-finding either. She simply stated the Board had already made the determination. And on appeal to the Board again, the Board simply stated its first decision was the law of the case on the issue of violent or dangerous. Now contrast that, Your Honors, with the in-depth fact-finding that the immigration judge had engaged in in Torres Falde Villas. The immigration judge evaluated the number of sexual encounters between the defendant and the victim, where the defendant had touched the victim, the nature of the acts. And even after that level of factual finding, the Board actually remanded the case for further fact-finding by the immigration judge. And it was after the additional fact-finding and further appeal, when the case came before this Court, that the Court determined that such a determination is, as I mentioned, fact-intensive individualized analysis of the offense in the agency's discretion and not reviewable. But because that determination presupposes that the agency actually engages in the required level of fact-finding, it doesn't preclude this Court from finding that the agency failed in its duties to fact-find and to sustain petitioner's appeal on that ground, Your Honors. I'm going to cede the remainder of the time to Michael Counsel. Thank you, Jennifer. May it please the Court, Louis Gordon for Petitioner Anatoly Volushkin. I wanted to address several salient points about the due process argument. To begin with, the immigration judge held the petitioner's bankruptcy as a negative adverse factor in his rehabilitation. And there was never any allegation of wrongdoing by the bankruptcy trustee. The property that was pledged was one of several properties pledged for the loan, yet the immigration judge, in error, determined that this is a negative factor. The immigration judge also said that she would hold a de novo hearing, but then selectively used the negative factors from the first hearing against the petitioner. And under Sadiac v. Gonzalez, the I.J. must indicate how they weighed all these factors Another point I believe that the I.J. erred in is she cites the possibility that the petitioner gave Mrs. Kobrynski, the victim in the case's daughter's number, to the crime figures. And there's no definite evidence of that. That was the FBI agent who had interviewed them, asked them about that, and he had denied that. And there's no evidence in the original trial testimony at page 1958 of that either as well. Turning to the deferral of removal case, I wanted to address the idea that somehow this is a string of suppositions that the petitioner would be harmed upon his return to Russia. Now we know that not one, but two experts in this case, Professor Shelley from George Mason University, who's an expert on Russian organized crime, and Professor Richard Anderson, who had been with the Central Intelligence Agency, both opine that the petitioner would be tortured upon his return to Russia. And what is clear in the facts here is that the petitioner cooperated with the government as part of his plea agreement, and that one of those organized crime figures was the unindicted co-conspirator in the case. And there's no supposition. It's very clear that were the petitioner to be returned to be harmed, and as Professor Shelley noted, Russian organized crime has a very long memory, and what would happen to him would be exacerbated because of his Jewish identity. Now there's another issue that's here, and that is the Board of Immigration Appeals was the petitioner's motion to remand in this case. The petitioner, pro se, had filed a motion to remand, stating that, or advising the BIA of the birth of another child, and that the mother of the child was unable to provide for herself or the child, and the BIA had no claim as to how it would affect his case, but it's clearly obvious how it would affect his case, and this should be remanded for a determination as to how that hardship fits into his case. I also wanted to address the United Nations Convention against Transnational Overseas Organized Crime, which this court, I do not believe, has ruled on. Several other circuits have addressed, and the board said it had no jurisdiction, but I believe that the case should again be remanded back to the BIA to determine this in the first instance. And, finally, there is the issue of the ongoing application for adjustment of status under 212 AH, which the Board of Immigration Appeals, contrary to its own precedent in matter of Malarcon, and this court's precedent in Rivera-Parasa, stated that the 15 years began upon the filing of the application and not when the application was heard. Therefore, the board never reviewed that issue, and the case should be remanded back to the Board of Immigration Appeals for it to review this determination under the proper standard. Thank you, Counsel. May it please the Court. My name is Ted Hurd. I'm appearing on behalf of the Respondent Attorney General. My proposal this morning, in terms of my argument as an appellee, would be to cover the areas that have been covered by opposing counsel, but, of course, if there are issues that the court would like me to address that the board adjudicated, I'd be happy to add those to my presentation, but I want to focus on the issues that each counsel has raised. First of all, I want to talk a little bit about the crimes involving moral turpitude issue. I think the threshold point that we want to make, which I think is very salient, is that this is an issue which we don't believe that Mr. Belush can ever fairly raise either in front of the board during his appeal or, in fact, in his opening brief in this court. The supplemental briefing that's been done in recent months is really whatever the state of the law is, as described by each of us, the plain and simple fact is that these issues were not raised in front of the board. The notice of appeal by Mr. Belushkin was basically saying this was not a fraud case, end of story, was not pursued in the brief at all on appeal. So there's an exhaustion issue, which that alone should preclude the court from having to get into the crime involving moral turpitude issue, and when you even look at Mr. Belushkin's case, the focus of his opening brief was entirely very fact-specific as to his conviction. He said, I did not do this with an intent to harm. I was doing this because I had fear. He was not saying, and I've been held removable under a crime that does not fit this court's jurisprudence. So Mr. Belushkin had two opportunities to raise these very precise issues that he's only now raising really an argument and a supplemental brief, and so the court really does not need to, and indeed I would submit lacks jurisdiction to get into these issues about whether section 1951 is or is not categorically a matter that involves a crime involving moral turpitude. So I don't think we need to even go this far into the argument. I'm happy to go further. I will make a couple points, which is that in terms of the body of jurisprudence going backward in time, I think again, as we said in our supplemental response, the court generally groups cases involving moral turpitude into various categories, but it's not universal. The Marmoleo case points that out. Another case the court decided, Rohit, involved prostitution. That's cited in our opening brief just for scope of review. I don't see how that fits the three elements. So there's not a generalization that is a three-factor required test. I would submit that the critical fact, if the court were even to reach this issue, is that the board here relied upon a published decision of its own, matter of C, from the 1950s. So contrary to what petitioners seem to argue here, this is not a situation where the board in 2011 found a crime involving moral turpitude in the extortion statute. No, indeed, in 1953, if my chronology is right, in matter of C, the board explored this and said, this is a vile crime. And it cited a Second Circuit case by Judge Learned Hand. It basically cited the Supreme Court decision, which dealt with the Anti-Bracketeering Act. So the foundation point, if the court ever were to reach this point, is really very solid here and would deserve Chevron deference, not alone distinguishes many, many of the cases that this court has decided since 2007, many of which lacked analysis, did not rely on published precedent. So I would say that this is a very solid issue in terms of the board saying extortion is categorically a crime involving moral turpitude. Matter of C, by the way, also is joined by matter of GT, which was an attempt threat, I believe, and matter of, I think it was matter of F, was a conspiracy case. So if you look back at the precedents, it covers three aspects of extortion in the board's 2011 decision. So I think in terms of that issue, we have a waiver problem, we have an exhaustion issue, and certainly the court shouldn't be going back and having the board decide something that in the first instance it was not given the opportunity to decide. It simply acknowledged that the notice of appeal said, well, this is extortion, and it recited its case law, but did not have to grapple with the jurisprudence of this court. So I would say that that's really not up for grabs. I think even today, opposing counsels conceded when you look at the indictment, when you look at the stipulated facts, all of which go together, contrary to what they said, one does not supersede the other. You look at those as a package, and there was clearly an effort to threaten, to intimidate, to coerce the Volushkin. Mr. Volushkin set, if you will, Mr. Gosmund into a situation where they were going to get that business by intimidating the couple. So he pled guilty in terms of this use of threats, and counsel has conceded that the threat of violence should bring it within this broad ambit. There were a chain of dominoes. He's not the one that kicked off the dominoes. Judge Clifton, if one looks at the fact, it is mainly true that the dominoes that ended up with that assault were oriented from the colleagues. There is evidence in the record that he was, that Mr. Volushkin was even threatening the Kabrinskis earlier in the year, and I would note this issue about whether he would go to Harvard Law School, Harvard, and say that, well, they were under-reporting their income. So there are some threats in the background. I agree, they're not part of the indictment. I want to point, go on if I can, to the violent or dangerous crime issue. Now, we submit that this is basically something that a torus of elitist, that this is a matter that the court has recently found is outside of its jurisdiction because it's a very fact-intense inquiry, whether something is violent or dangerous. I would also submit, contrary to what counsel has said, that there's sufficient findings of fact when you combine the immigration judge's analysis and the board's statement that the crime at issue was certainly violent or dangerous. I don't think that one had to pigeonhole it into that category. There's sufficiency there, and in any event, we say it's not even reviewable. Again, one can look at the indictment record 2770. The argument the petitioner appears to be trying to make here may merge back into kind of a due process argument, saying in effect that, okay, if it's a factual determination, that might not be reviewable, but there wasn't really a factual determination here. What would you point to that would give a sufficient assurance that, in fact, it was made as a factual determination based on the particulars of the case? Well, I would say that, I would say that the second immigration judge, in her decision, in the context of the waiver of admissibility, goes through each of the details, the background of Mr. Volushkin's conviction, the criminal activities, and she balances those against the equities. So in the second part of her decision, there's extensive discussion of all of the trial testimony, and she gives credit to Mr. Volushkin. At one point, she says there are some substantial equities here, but they're overtaken by the nature of this crime, the threat to the daughter, the enrolling, the enlisting of the two fellows in New York. All of that is really solid in terms of the immigration judge looking at this, and I know Mr. Gordon has said, well, there's a violation of due process here, but what I think he's really saying is the result was not what his client had gotten from the first immigration judge. The second immigration judge, contrary to cherry-picking evidence or a notion that somehow there was not an opportunity, Mr. Volushkin, if you look at the transcripts, had a full opportunity to present witnesses, character witnesses, lay opinion. He had a psychologist in terms of the harm to his daughter from the separation and deportation, work colleagues, friends, people, other people from the testimony of the FBI agent who interviewed Mr. Volushkin even after his conviction, but I don't see in the record, I could be wrong, I don't see in the record some notion either during the original proceedings or the remand proceedings, petitioner's counsel saying this is unfair, this is not what we had in mind in terms of the remand from the board. They accepted it was going to be de novo, and Mr. Volushkin testified extensively on remand, and he explained all of the circumstances of his business, he explained all the circumstances of his extortion, and he explained his rehabilitation as he viewed it, but the immigration judge was not compelled to accept that. Indeed, if we strip away the due process aspect, we would certainly submit that under this court's jurisprudence that the court would not have jurisdiction to re-weigh the equities of whether there's the heightened standard of hardship to the family based on Mr. Volushkin's removal. But coming back to the point your honor has made, coming back to the point that Mr. Gordon has made, it seems to me that we don't have a situation of selectivity, we don't have a situation of cherry picking, the immigration judge's direct examination, he reaches a different result in terms of whether under the heightened standard that Mr. Volushkin just has not reached that heightened standard, and this is a point I would make if I have time in a different portion of this argument. The other critical point about immigration judge Sitgrave's decision is that she says even if all of these equities balanced in I would still exercise, I do exercise my discretion to say that I'm not giving him a waiver of his inadmissibility because of his criminal situation. He looked at all, she looked at all those factors under a matter of NAM, she ultimately decided that in her discretion she was not going to grant that waiver of inadmissibility. So when Mr. Gordon in another portion of his argument says, well when the board denied the motion to remand based upon the birth of the son, we have to remember that when Mr. Volushkin made that argument he basically said I have a son, I have now shown exceptional hardship. But the board in denying that motion said that is not really what's at issue here, what is at issue here is whether you've prevailed to show that we go back and give you something by way of reopening the case. But don't forget then the immigration judge said, as a matter of discretion, I'm not going to give you relief from removal. So putting aside the issues of, I guess I'd say in terms of the motion to reopen, the board looked at it sufficiently and the board had no reason to reopen the case. The immigration judge had already addressed not only hardship but more The denial based on exercise of discretion, could that not have been affected by the additional positive factor of having a son or the new child to support or the new child and mother to support, the child is a U.S. citizen. The IJ couldn't have taken that into account because it hadn't happened by that time. Well I agree that it had not happened at that point in time, but immigration judge Sitgrave's decision in that aspect of it is really founded on the nature of what Mr. Volushkin did. And however one might disagree or agree with that I'm basically saying that the equities are outweighed by his conduct. And in terms of discretion, that's what tips the hand against waiving an admissibility. So I think if you look at her decision, I don't think that the birth of another child would have had any applicability. It's speculative to think that it would. So I think that's the answer to that question. I wanted to address a few minutes the issue of the continuing application problem, which Mr. Gordon also addressed. This is a complicated issue which was raised in his brief, which basically is could Mr. Volushkin have prevailed on a waiver of inadmissibility regardless of hardship under the first subsection of 212H. But the board in its decision basically said we don't see that the clock can keep ticking. In other words, you have a 15 year window and you committed a crime in 1994. Here we are, you filed an application for to a small extent and in his reply brief, Mr. Volushkin says well wait a minute, the board looks at matters of applications on a continuing basis. And therefore this 15 years really sort of runs out over time because my application can be considered pending. Well first of all that issue was not really I think ventilated below, certainly not in the way it's been described today. But the matter of that Mr. Volushkin's counsel had cited actually does not stand for that proposition at all. In matter of Alicon, the issue there was when various changes to the 1990-1991 Immigration Act reforms were going to affect that alien's case. And in a footnote, I think it's footnote four in that decision, the board says oh and he doesn't meet the 15 years. So matter of Alicon does not support Mr. Volushkin's point. Mr. Volushkin cites the Rivera case. The Rivera case doesn't cite that either. In passing, this court says there's a 15 year issue here. So that doesn't help. In terms of how the board looks at things, it is true that the board will look at cancellation of removals. For instance, if you have a qualified relative later in time, you may be eligible for relief later in time even if you weren't eligible for it at the time of the notice to the board. The issue that we're dealing with here in terms of a waiver of inadmissibility basically is that the activities occurred more than 15 years before the date of the application. And no matter how you slice it, 1994-2002, it does not add up to 15 years. I would submit that this is a clock runs out on that conviction. It's too late. It's stale. But Mr. Volushkin's conviction was 1996 based on 1994 activities and the board was entirely correct that the clock doesn't tick away so that he can somehow. Otherwise, the 15 years has no objective meaning. It could never be a cancellation of removal. We're applying a different statute. It actually said that there's not a continuing application. You look at good moral character during a 7 year period and that's at 769-Fed3-699. All I'm saying here, your honors, is that each statute, each part of the Immigration Act, has to be looked at very particularly and very specially for its objectives. The objective of the board to look at evolving facts and evolving law, the cases cited in Mr. Volushkin's reply brief, is wholly different from the situation we have in front of us where the 15 years really does have to mean something and that conviction really is a bar to admissibility. Coming back to the due process claim, maybe I've said this before and I'm repeating myself so please stop me. I just want to reiterate that the equities here are not within the court's jurisdiction. It's only because he's arguing due process. I want to make a similar point because we haven't touched on this and again this is an issue that was not addressed, is the issue about whether there's a bar to asylum or withholding of removal because Mr. Volushkin was convicted of a particularly serious crime. Now again, Mr. Volushkin in his briefing, and we've said in our briefing, that there are a few legal issues there, but we again want to urge the court that in decisions like Penchikov, the court cannot reevaluate the facts in terms of whether Mr. Volushkin was convicted of a particularly serious crime. One of the legal issues in the knowledge jurisdiction is he said well this was not an aggravated felony, but in the court's Delgado decision, the court said it doesn't matter, the Attorney General looks at conduct, looks at crimes that are without being the constraint of the aggravated felony limitation. Again, coming back to Judge Clifton's question about the IJ, the IJ looked at issues, he looked at the factors that he had to look at under matter of NAM, so I think that's well covered. I want to take a minute or two on the torture claim. Basically, Your Honor, I think this is a situation where we have speculation. The IJ cited the matter of JFF case, very instructive. The aliens' fears of harm are based on a chain of contingencies. Now we really don't have any sort of certainty, despite what Mr. Gordon has said, that in fact Mr. Volushkin has cooperated in such a way with American authorities that Russian Mafia members are going to target him if he comes back to Russia. A salient point was that Mr. Volushkin's wife and daughter have gone to Russia on many occasions, and although he seemed to be concerned about it, he didn't stop them from going. His parents have not been injured in Russia. He has, yes he does have experts, Mr. Shelley, Professor Shelley and Professor Patterson, I think, who basically say organized crime is very powerful in Russia, there's anti-Semitism in Russia, etc. But again, if you look at the immigration judge's account of their testimony on cross-examination, Mr. Patterson is a live witness, he was speculating, well if this happens, perhaps this can happen. I want to contrast this with the State Department report, which we cited in the record, that basically says that the Russian government, for example, does go after anti-Semitism. There are no more questions, I think my time is up, but I'd answer a question. Thank you, Ken. Your Honor, two quick points. The first regarding the violent or dangerous. I fully disagree with the Respondent's position that this court can rely upon Judge Sickgrave's statement in her decision that the Board had decided the matter for her in the first decision of the Board. And the Board very clearly stated in its second decision that it was relying on its first decision as law of the case. Judge Sickgrave's decision played no role in finding a violent or dangerous crime for Mr. Voloshnikov. Secondly, Your Honors, I would like to return to the crime involving moral turpitude issue for a moment. First of all, I think it's important to put this in context. The only ground of removability that has been sustained against the Petitioner is one for a crime involving moral turpitude. So this is not merely an issue of his eligibility for relief, but whether he is in fact whether or not this was a crime that necessarily involved acts of violence or had the requisite level of intent were raised. I would point to pages 39, where the opening brief states that the conviction didn't require any actual violence, and page 41, where the opening brief analyzes under the standard of matter of sylva-travino. Is this the opening brief to us or the opening brief to the BIA? No, this is to the opening brief to this Court. So you're not speaking to the exhaustion question? No, Respondent Head asserted that it wasn't even covered in the opening brief that was filed with this Court, and I wanted to note that that wasn't accurate. And I would also note, Your Honors, that there have been really quite dramatic changes in the way crimes involving moral turpitude are analyzed since the Board's decision, not the least of which is that the Attorney General has withdrawn his opinion in matter of sylva-travino, and that this Court had previous to that actually struck it down anyway as a matter of analyzing it. So, for those reasons, Your Honor. Could you take a second to follow up on Judge Clifton's question as to exhaustion before the Board? I'm sorry, Your Honor, I didn't hear you. Could you just take a minute on the follow-up on Judge Clifton's question, not on exhaustion in the opening brief here, but on whether there was exhaustion before the Board? The issue of moral turpitude was raised. I concede that the specific issue of whether or not the standard articulated in Nunez in the following decisions was not cited as the reason. But issues regarding the crime involving moral turpitude were raised. And the Board did rely on its per se determination that crimes of extortion, regardless of what the individual statute might say, are crimes involving moral turpitude, even though a matter of C is not, in fact, about the Hobbs Act. And therefore, under this Court's jurisprudence, would not be entitled to Chevron deference because it's not about the statute at issue in this case. Thank you, Counsel. The case just argued will be submitted.
judges: Reinhardt, Fernandez, Clifton